UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ETONYA BONDS,

                            Plaintiff,

              -against-

COUNTY OF WESTCHESTER, WESTCHESTER DEPARTMENT OF CORRECTIONS, COUNTY EXECUTIVE GEORGE LATIMER, COMMISSIONER OF CORRECTIONS JOSEPH SPANO, in his individual and official capacities, DEPUTY COMMISSIONER JUSTIN PRUYNE, in his individual and official capacities, WARDEN LEANDRO DIAZ, in his individual and official capacities, WARDEN WALTER MOCCIO, in his individual and official capacities, CAPTAIN STEVEN YANKOWSKI, in his individual and official capacities, CAPTAIN WENDELL SMILEY, in his individual and official capacities, CAPTAIN CHRIS THOMALEN, in his individual and official capacities, CAPTAIN SHIVAUN CARDEN, in her individual and official capacities, CAPTAIN VAN LIEROP, in her individual and official capacities, "JOHN/JANE DOES 1-10," in their individual and official capacities, and ALAN S. BERKOWER, M.D. in his individual and official capacities.

                        Defendants.

**DOCKET NO.:  CV-19-1712**

<u>**COMPLAINT**</u>

***JURY TRIAL DEMANDED***

Plaintiff, by and through her attorneys, The Law Offices of Frederick K. Brewington, as and for her Complaint against the Defendants respectfully sets forth:

<u>**INTRODUCTION**</u>

1.     This is a civil action seeking monetary and injunctive relief against the COUNTY OF

WESTCHESTER, WESTCHESTER DEPARTMENT OF CORRECTIONS, COUNTY
EXECUTIVE GEORGE LATIMER, COMMISSIONER OF CORRECTIONS JOSEPH SPANO,
DEPUTY COMMISSIONER JUSTIN PRUYNE, WARDEN LEANDRO DIAZ, WARDEN
WALTER MOCCIO, CAPTAIN STEVEN YANKOWSKI, CAPTAIN WENDELL SMILEY,
CAPTAIN CHRIS THOMALEN, CAPTAIN SHIVAUN CARDEN, CAPTAIN VAN LIEROP and
"JOHN/JANE DOES 1-10," representing unknown and unidentified persons believed to be members
of WESTCHESTER DEPARTMENT OF CORRECTIONS, for committing acts, in part, under color
of law, depriving Plaintiff of rights secured by the Constitution, and laws of the United States,
pursuant to Title VII, 42 U.S.C. § 2000(e) *et.al*, the Americans with Disabilities Act , *as amended*
(herein "The ADA")§ 42 U.S.C. 12112, the Rehabilitation Act of 1973 ("RCA") 29 U.S.C. § 794,
§ 504, and 42 U.S.C. § 1983 for violations of the Fourth, and Fourteenth Amendments to the United
States Constitution including but not limited to discrimination based on disability, failure to provide
a reasonable accommodation, differential treatment vis-a-vis hostile work environment, retaliation
conspiracy to wrongfully terminate Plaintiff between County Defendants and Defendant ALAN S.
BERKOWER, M.D., failure to train and failure to investigate.

## JURISDICTION AND VENUE

2.        This federal civil rights action is brought pursuant to Title VII, 42 U.S.C. § 2000(e)
*et.a*l, the Americans with Disabilities Act , *as amended* (herein "The ADA")§ 42 U.S.C. 12112,  the
Rehabilitation Act, 29 U.S.C. §794, § 504, and 42 U.S.C. § 1983 for violations of the Fourth, and
Fourteenth Amendments to the United States Constitution.

3.        Jurisdiction is founded upon 28 U.S.C.  §§ 1331 and 1343 and the aforementioned
statutory and constitutional provisions. Plaintiff further invokes the supplemental jurisdiction of this

Court under 28 U.S.C. § 1367 to hear and decide claims arising under state law.

4.     Venue is properly laid in Southern District under 28 U.S.C. § 1391(b); this being the District in which at least one of the Defendants resides and where the action complaint of herein occurred.

5.     Prior hereto, on or about May 19, 2017 Plaintiff filed Charge of Discrimination Case No. 520-2017-02370 against Defendants with the United States Equal Employment Opportunity Commission (hereinafter "EEOC") and cross filed with the New York State Division of Human Rights (hereinafter "NYSDHR") and alleging her wrongful discrimination due to the Defendants' animus on the basis of Plaintiff's disability and failure to provide a reasonable accommodation .

6.     On or about June 5, 2018, Plaintiff filled an Amended Charge of Discrimination Case No. 520-2017-02370 against Defendants with the EEOC and cross-filed with the NYSDHR and alleging her wrongful discrimination due to Defendants' animus on the basis of Plaintiff's disability, failure to provide a reasonable accommodation and retaliation for voicing opposition to Defendants' discriminatory acts.

7.     On November 26, 2018, Plaintiff received a Notice of Right to Sue Within 90 Days, issued by the U.S. Department of Justice with regard to EEOC Charge No. 520-2017-02370 (copy annexed hereto Exhibit A).  As of the filing date of this complaint, ninety days from the date of receipt of the Notice of Right to Sue has not yet passed.

## PARTIES

8.     Plaintiff ETONYA BONDS is a citizen of the United States and State of New York and resides in Westchester County .

9.      At all relevant times, Defendant COUNTY OF WESTCHESTER("COUNTY") is and is a municipality organized and existing under the laws of the State of New York with its principal offices located at Michaelian Office Building, Rm. 600,  148 Martine Avenue, White Plains, New York.

10.     At all times mentioned, the WESTCHESTER DEPARTMENT OF CORRECTIONS (herein "Corrections") was and is a department or agency of the COUNTY. At all times mentioned, Defendant COUNTY was and is responsible for the control of CORRECTIONS, its agents and employees, and the COUNTY was and is responsible for the appointment, training, supervision, promotion and discipline of corrections officers and/or staff  of CORRECTIONS, including individual Defendants COMMISSIONER OF CORRECTIONS JOSEPH SPANO, DEPUTY COMMISSIONER JUSTIN PRUYNE, WARDEN LEANDRO DIAZ, WARDEN WALTER MOCCIO, CAPTAIN STEVEN YANKOWSKI, CAPTAIN WENDELL SMILEY, CAPTAIN CHRIS THOMALEN, CAPTAIN SHIVAUN CARDEN, CAPTAIN VAN LIEROP and "JOHN/JANE DOES 1-10." In naming the "COUNTY," Plaintiff included and intended to include the WESTCHESTER DEPARTMENT OF CORRECTIONS.

11.     Defendant, COUNTY EXECUTIVE GEORGE LATIMER (hereinafter "County Exec. Latimer") is a male, and at all times relevant to this complaint, served/serves as a County Executive to the COUNTY OF WESTCHESTER. Upon information and belief, Defendant COUNTY EXECUTIVE LATIMER is the chief executive officer of the County of Westchester and has been granted authority to make policy and is a facilitator of all policies within the COUNTY OF WESTCHESTER, interacts with other COUNTY OF WESTCHESTER policymakers, and is charged with the ultimate responsibility of overseeing the WESTCHESTER DEPARTMENT OF

-4-

CORRECTION'S employees, employee-management relations and the policies and procedures implemented at CORRECTIONS and is sued individually and officially.

12.     Defendant, COMMISSIONER OF CORRECTIONS JOSEPH SPANO(hereinafter "Commissioner Spano") is a male, and at all times relevant to this complaint, served/serves as a Commissioner to the WESTCHESTER DEPARTMENT OF CORRECTIONS. Upon information and belief, Defendant COMMISSIONER SPANO has been granted authority to make policy and is a facilitator of policy within the COUNTY OF WESTCHESTER, interacts with other COUNTY OF WESTCHESTER policymakers, and is charged with the duties of overseeing the WESTCHESTER DEPARTMENT OF CORRECTION'S employees, employee-management relations and the policies and procedures implemented at CORRECTIONS and is sued individually and officially.

13.     At all relevant times, Defendant, DEPUTY COMMISSIONER JUSTIN PRUYNE (hereinafter "Dep. Commissioner Pruyne") is a male, and at all times relevant to this complaint, served/serves as a Deputy Commissioner to the WESTCHESTER DEPARTMENT OF CORRECTIONS. Upon information and belief, Defendant DEPUTY COMMISSIONER PRUYNE has been granted authority to make policy and is a facilitator of policy within the COUNTY OF WESTCHESTER, interacts with other COUNTY OF WESTCHESTER policymakers, and is charged with the duties of overseeing the WESTCHESTER DEPARTMENT OF CORRECTIONS' employees and employee-management relations and the policies and procedures at CORRECTIONS and is sued individually and officially.

14.     At all relevant times, Defendant, WARDEN LEANDRO DIAZ (hereinafter "Warden Diaz ") is a male, and at all times relevant to this complaint, served/serves as a Warden at the WESTCHESTER DEPARTMENT OF CORRECTIONS. Upon information and belief, Defendant

-5-

WARDEN DIAZ has been granted authority to make policy and is a facilitator of policy within the COUNTY OF WESTCHESTER, interacts with other COUNTY OF WESTCHESTER policymakers, and is charged with the duties of overseeing the WESTCHESTER DEPARTMENT OF CORRECTIONS' employees and employee-management relations and the policies and procedures at CORRECTIONS and is sued individually and officially.

15.     At all relevant times, Defendant, WARDEN WALTER MOCCIO (hereinafter "Warden Mocco") is a male, and at all times relevant to this complaint, served/serves as a Warden at the WESTCHESTER DEPARTMENT OF CORRECTIONS. Upon information and belief, Defendant WARDEN MOCCIO has been granted authority to make policy and is a facilitator of policy within the COUNTY OF WESTCHESTER, interacts with other COUNTY OF WESTCHESTER policymakers, and is charged with the duties of overseeing the WESTCHESTER DEPARTMENT OF CORRECTIONS' employees and employee-management relations and the policies and procedures at CORRECTIONS and is sued individually and officially.

16.     At all relevant times, Defendant CAPTAIN STEVEN YANKOWSKI (hereafter "Cpt. Yankowski") is a citizen of the United States and State of New York. At all times mentioned, he was employed by Defendant CORRECTIONS and acted under color of law and color of his authority as an officer, agent, servant and employee of the COUNTY. CAPTAIN STEVEN YANKOWSKI was one of Plaintiff's supervisors during all relevant times and is sued individually and officially.

17.     At all relevant times, Defendant CAPTAIN WENDELL SMILEY (hereafter "Cpt. Smiley") is a citizen of the United States and State of New York. At all times mentioned, he was employed by Defendant CORRECTIONS and acted under color of law and color of his authority as an officer, agent, servant and employee of the COUNTY. CAPTAIN WENDELL SMILEY was one

of Plaintiff's supervisors during all relevant times and is sued individually and officially.

18.    At all relevant times, Defendant CAPTAIN CHRIS THOMALEN(hereafter "Cpt. Thomalen") is a citizen of the United States and State of New York. At all times mentioned, he was employed by Defendant CORRECTIONS and acted under color of law and color of his authority as an officer, agent, servant and employee of the COUNTY. CAPTAIN CHRIS THOMALEN was one of Plaintiff's supervisors during all relevant times and is sued individually and officially.

19.    At all relevant times, Defendant CAPTAIN SHIVAUN CARDEN(hereafter "Cpt. Carden") is a citizen of the United States and State of New York. At all times mentioned, she was employed by Defendant CORRECTIONS and acted under color of law and color of her authority as an officer, agent, servant and employee of the COUNTY. CAPTAIN SHIVAUN CARDEN was one of Plaintiff's supervisors during all relevant times and is sued individually and officially.

20.    At all relevant times, Defendant CAPTAIN VAN LIEROP (hereafter "Cpt. Van Lierop") is a citizen of the United States and State of New York. At all times mentioned, she was employed by Defendant CORRECTIONS and acted under color of law and color of her authority as an officer, agent, servant and employee of the COUNTY. CAPTAIN VAN LIEROP was one of Plaintiff's supervisors during all relevant times and is sued individually and officially.

21.    Upon information and belief, POLICE OFFICER JOHN AND JANE DOES 1-10 (hereinafter "JOHN/JANE DOES 1-10"), whose names are not known to Plaintiff as of the date of filing this Complaint, were and/or are police officers employed by Defendant COUNTY within the SCPD. Defendants JOHN/JANE 1-10 are each being sued herein in their individual and official capacities.

22.     At all relevant times, Defendants "JOHN/JANE DOES 1-10" (hereinafter JOHN/JANE 1-10) whose names are not known to Plaintiff as of the date of filing this Complaint, were and/or are employed by Defendant COUNTY within the Department of CORRECTIONS. At all times mentioned Defendants JOHN/JANE 1-10 are each being sued herein in their individual and official capacities.

23.     At all relevant times, ALAN S. BERKOWER, M.D. (hereafter "Dr. Berkower") is and was a citizen of the United States and State of New York. At all times mentioned, Dr. Berkower was and is employed as an otolaryngologist, with offices located at 3250 Westchester Avenue, Suite 101, Bronx, New York.  Dr. Berkower was hired by DEFENDANT COUNTY to conduct a medical examine related to  Plaintiff's hearing loss and he is sued individually and officially.

## STATEMENT OF FACTS

24.     Plaintiff ETONYA BONDS , is a forty-four year old African American female and resides in New Rochelle, New York, and has been employed as a Correction Officer at Defendant Corrections for in excess of fifteen years.  Plaintiff current holds the rank of Sergeant.

25.     During Plaintiff's entire career with Defendant Corrections, she has been assigned to work in the cell block, which is an environment that consists of constant loud repetitive noises such as, but not limited to the clanging of the jail cell doors, alarms, loud speaks and radios.

26.     Plaintiff, has a hearing disability recognized under the ADA and wears hearing aids that require a quasi-surgical procedure to be removed.

27.     In or about January 2017, Plaintiff spoke with Defendant Warden Diaz and requested a reasonable accommodation based on Plaintiff's hearing impairment to be reassigned to an administrative position, away from the loud, repetitive noises that negatively impacted and continue

to negatively impact Plaintiff's ability to hear.

28.     Based on information and belief, Defendants continual assignment of Plaintiff to the cell blocks over the past sixteen years plus has negatively impacted Plaintiff's hearing.  Prior to working as a Correction Officer for Defendants, Plaintiff never had any issues with her hearing.

29.     Defendant Diaz refused to grant Plaintiff's request for a reasonable accommodation to be relocated to an administrative position outside of the noisy cell blocks even though he stated to Plaintiff that he was aware and concerned about her hearing impairment.

30.     Defendant Diaz claimed that there was no where to place Plaintiff even though Plaintiff was aware of approximately four open positions in administration for a correction officer to fill.

31.     Defendants frequently provided transfers to other positions for correction officer or even created positions for other officers who were otherwise similarly situated, but did not suffer from specified medical needs.

32.     Prior to request a reasonable accommodation Plaintiff was never suspended or docket pay or received any written discipline in Plaintiff's fifteen plus year career with Defendants.

33.     On April 8, 2017, Plaintiff was assigned as Sector Sergeant for the Old Jail.  On that date three inmate incidents occurred simultaneously that required Plaintiff's immediate attention: 1) Plaintiff was splashed with bodily fluids of an inmate; 2) several Correction Officers were in the process of being splashed with urine and feces from multiple inmates; and 3) and an inmate attempted suicide.

34.     The Sector for the Old Jail housed twenty-eight inmates who all suffered from mental illness and consisted of two tiers.

35.     As all of the incidents that occurred on April 8, 2017 were in Plaintiff's sector, Plaintiff was responsible for filling out three use of force packets, which each contain substantial amounts of paperwork.

36.     Plaintiff's paper work included a medical packet for each Corrections Officer, Plaintiff and the Captain on duty who all went to the emergency room based on contact with urine and feces thrown by the inmates.  This fact was especially true on April 8, 2017 as one of the incidents had involved multiple Correction Officers and Plaintiff was responsible for filling out each medical packet.

37.     Plaintiff was unfairly harassed and targeted by her Captains to finish the paperwork regarding the incidents in an unreasonable amount of time.

38.     Captain Marble was ordered to give Plaintiff a formal written discipline by the Warden, however Captain Marble refrained and gave Plaintiff a verbal counseling instead for not writing this incident in the logbook, as the Warden's order was unduly severe.

39.     On or about May 11, 2017, Plaintiff informed Defendant Cpt. Smiley that she was being harassed and unfairly targeted by her superiors.  Plaintiff provided specific examples of such harassment and situations for which Plaintiff was being unfairly blamed to Defendant Cpt. Smiley.

40.     One such example provided to Defendant Cpt. Smiley was the April 8, 2017 incident and the amount of paperwork Plaintiff was expected to finish in a short period of time unlike any other Sergeants or Plaintiff in the past, prior to making a request for a reasonable accommodation based on her hearing impairment.

41.     Defendant Cpt. Smiley's sole response to Plaintiff's concerns was to instruct Plaintiff to "just do your job."

42.     Based on information and belief, Defendant Cpt. Smiley failed to conduct any investigation into Plaintiff's complaint regarding unfair treatment and harassment by Plaintiff's supervisors at Defendant Corrections.

43.     On or about May 19, 2017, Plaintiff was assigned second response which Plaintiff's disability prevented Plaintiff from being able to fulfill. Defendants were aware of this fact based on a medical note provided by Plaintiff's doctor.

44.     Plaintiff reminded Defendant Cpt. Thomalen she  was unable to do second response due to Plaintiff's medical restrictions.

45.     At that point, Plaintiff was informed that a new medical note was required from Plaintiff's doctor because the one she had previously provided "expired."  Plaintiff informed Defendant Cpt. Thomalen that she would call her doctor and get her doctor to fax over a new medical note with the restrictions.

46.     In response to Plaintiff reminding Defendant Thomalen about her medical restrictions, Defendant Cpt. Thomalen became irate toward Plaintiff and commenced yelling at Plaintiff in front of Plaintiff's colleagues and other Corrections staff.

47.     Defendant Cpt. Thomalen reluctantly switched Plaintiff's and Officer Michael Simmons' assignments.

48.     On that same day, about two hours into Plaintiff's shift, after the incident with Defendant Cpt. Thomalen, at the Warden's briefing, Defendant Cpt. Thomalen ordered Plaintiff to go home.

49.     Defendant Cpt. Thomalen stated to Plaintiff that since she was unable to fulfill her Sergeant's duties she was to go home. Defendant Ctp. Thomalen's contention was utterly false since

-11-

Plaintiff had been fulfilling her Sergeant's duties that day from 7:00 am until she was confronted once again by said Defendant.

50.     Plaintiff discovered that Defendant Warden Leandro Diaz instructed Defendant Thomalen to send Plaintiff home that day. As such, Plaintiff went to speak to Defendant Warden Diaz and explained that Plaintiff's note would be arriving once doctor got into his office that very same morning.

51.     Despite notice of the need for the accommodation and there being no further need for Defendants to take any affirmative actions related to this situation, Defendant Warden Diaz was adamant that Plaintiff go home. This represented another example of harassment and Plaintiff being singled out, as other Sergeants, such as Roy Omess, were not required to provide medical documentation to avoid assignment to second response.

52.     As Plaintiff was unjustly forced to leave work on May 19, 2017, by Defendant Warden Diaz and Cpt. Thomalen, Plaintiff went directly to Equal Employment Opportunity Commission (herein "EEOC") in New York City and to filed a discrimination complaint alleging violations of the ADA by Defendants.

53.     Following that filing, on or about July 17, 2017, Plaintiff received a formal counseling from Captain Adrian Coley . Defendant Warden Maccio ordered Captain Coley to write the formal counseling against Plaintiff, which was entirely false and improper.

54.     Defendant Warden Maccio ordered Captain Coley to write the formal counseling against Plaintiff in retaliation for Plaintiff filing the EEO complaint against the other Warden, Defendant Warden Diaz and Defendants.

55.     Specifically, Plaintiff received the formal counseling for a report that was approved by and signed off on by Plaintiff's superior, Captain Coley. There was an incident with a mentally unstable inmate who was in no condition to provide a written or verbal statement due to the inmates medical and mental state at the time of said incident. Defendant Warden Moccio insisted that Plaintiff receive a formal counseling for not obtaining a statement from said inmate even though it was impossible to do so because of inmate's mental state.

56.     Two days after the July 17, 2017 incident, on or about July 19, 2017, Defendant Cpt. Carden denied Plaintiff overtime to complete the required paperwork, which was an unusual occurrence.

57.     On or about July 24, 2017, Plaintiff made a formal request for reasonable accommodation pursuant to the ADA for Plaintiff's hearing impairment to be transferred to an administrative position.  Based on information and belief approximately four such positions for which Plaintiff was qualified were open and waiting to be filled at Defendant Corrections.

58.     Plaintiff's Union Representative, Officer Peter Dichiari, was present when Plaintiff was served with the formal discipline.  Officer Peter Dichiari stated that the discipline would be thrown out or dropped to a verbal counseling, as the write-up was ludicrous, however, the formal counseling stuck and Plaintiff's  rebuttal to the formal discipline was never addressed nor considered.

59.     On or about August 3,  2017, Plaintiff was out of work due to an on the job injury, yet Defendants' Special Investigation Department ordered Plaintiff  to return to work for an investigation.

60.     Once Plaintiff completed the investigation the Defendants tried to make Plaintiff stay and complete a use of force packet, even though Plaintiff was injured and excused from work due to said injury. This treatment was yet another act of different and retaliatory treatment.

61.     The use of force  packet was owed to Defendant Captain Shivaun Carden.  Prior to Plaintiff's injury, when Plaintiff was at work and attempted to stay to complete the use of force packet, Defendant Captain Carden refused to permit Plaintiff to complete the use of force packet. Now that Plaintiff was out of work due to injury, Defendants were insisting on Plaintiff returning to work to complete said packet.

62.     On or about August 16, 2017, Defendant Captain Steven Yankowski came to Plaintiff's house to hand deliver Plaintiff's performance evaluation.

63.     Plaintiff immediately telephoned Bruce Donnelley, the Union President, to inform Mr. Donnelley that Defendant Yankowski had just hand delivered her performance evaluation to her home.  Plaintiff is not aware of any other employee of Defendants who had a performance evaluation hand delivered to their home by a supervisor, no less while they were out of work on an absence due to injury .  This was not the policy, custom or practice of Defendants.

64.     Plaintiff then returned once more to EEO in Westchester to make a complaint of further harassment based on Plaintiff's disability and in retaliation for Plaintiff's original EEO complaint.

65.     Plaintiff spoke with Adelita Davis who handles EEO complaints.  Plaintiff stated in her EEO Complaint "On 8/16/2017 officials from my job have shown up at my home unannounced to give me a performance evaluation. The evaluation was poor in its entirety. That was the absolute last straw I am experiencing psychological damage for all the discrimination, harassment, and stress

that job has given me. I cannot go to my union because it is a conflict of interest since they are also representing the people who are defaming my character and my work ethics, by bullying, harassing and discriminating against me."

66.     Defendant Leandro Diaz went to Plaintiff's superiors, the Captains and asked if "there was anything you can think to write up Bonds about?" Captain Patti Bhola responded "no" to which Defendant Warden  Diaz responded "Are you sure you don't have anything?"

67.     Prior to receiving the hand delivered evaluation,  Defendant Captain Smiley pulled Plaintiff into his office and informed Plaintiff that he did not know what Defendant Corrections was planning however, Defendant Smiley's superiors order him to write an evaluation for Plaintiff and only for Plaintiff no other Corrections Officers whom Defendant Smiley supervised.

68.     Defendant Smiley's superiors reviewed the evaluation he wrote for Plaintiff, and ordered Defendant Smiley to change the evaluation twice, for the sole purpose of ensuring Plaintiff received a very poor evaluation, contrary to Plaintiff's actual job performance.

69.     Once Plaintiff  received her evaluation, Plaintiff confirmed that she was the sole employee at Defendant Corrections that received an evaluation and made a complaint to the Defendants regarding the fact that this was another form of harassment and retaliation for Plaintiff's discrimination complaints to the EEOC.

70.     In or about late August 2017, Defendants received Plaintiff's formal EEOC complaint from the EEOC regarding the July 17 and July 19, 2017 incidents.

71.     It was only **AFTER** Plaintiff complained about being singled out for evaluation that Defendant Corrections commenced evaluating Plaintiff's colleagues.

-15-

72.     When Plaintiff returned to work her following her job injury, Plaintiff returned with medical restrictions and walked with a limp. Defendants refused to assign Plaintiff to the desk area where Plaintiff was qualified to work. Instead Defendants assigned Plaintiff to the worst place in the jail five days a week, not switching Plaintiff, while every other Sergeant was switched or rotated every two to three days.

73.     Plaintiff went to Chief Birritella and complained as Chief Birritella was in charge of all EEO in at Corrections. Chief Birritella never followed up with Plaintiff regarding her discrimination and harassment complaints.

74.     On or about September 1, 2017, Plaintiff received a certified letter dated August 24, 2017, from Defendant Deputy Commissioner Justin Pruyne stating he had been unaware of Plaintiff's hearing disability and that if provided proper medical documentation, Defendant Pruyne would be happy to meet with Plaintiff to discuss a reasonable accommodation. Defendant Pruyne never provided Plaintiff with the reasonable accommodations she required.

75.     On or about November 15, 2017 Plaintiff received an unwarranted formal counseling from Defendant Carden for an incident that occurred on November 8, 2017 when she was assigned to the Old Jail as Sector Supervisor on the 7:00 am to 3:00 pm tour.

76.     On November 8, 2017, at approximately 2:35 pm, Plaintiff was informed by the 2West Block Officer that an inmate, Jeru Basket, was laying on the 2West D-Side tier floor and was refusing to lock into his cell.

77.     When Plaintiff arrived on scene, Plaintiff ordered Inmate Basket several times to get off the floor and lock into his cell, orders with which Inmate Basket repeatedly refused to comply. As a result of Inmate Basket's repeated failure to comply with Plaintiff's orders, Plaintiff notified

the Shift Commander, Captain Roy Omess (herein "Cpt. Omess"), of the situation.

78.     Cpt. Omess informed Plaintiff that he would send the Patrol Captain to 2West for de-escalation. Defendant Carden, the Patrol Captain sent Cpt. Omess, to 2 West for de-escalation, however Defendant Carden was delayed arriving to the scene as Defendant Carden was first handled a de-escalation on the first floor of the Old Jail.

79.     Plaintiff explained to Defendant Carden the incident in progress involving Inmate Basket. Defendant Cpt. Carden proceeded to attempt to de-escalate situation on the tier. Plaintiff was with Defendant Cpt. Carden on the tier when Plaintiff notified said Defendant that Inmate Basket was: 1) playing; 2) refusing to get off the floor; 3) had slid off the bench and was laying down on the tier; and 4) was not injured in anyway. This was witnessed by the 2 West Block Officer.

80.     After informing Defendant Cpt. Carden of the situation with Inmate Basket, Plaintiff repeated direct orders to Inmate Basket to get off the floor and for said Inmate to lock in his cell again, in the presence of Defendant Cpt. Carden.

81.     Plaintiff further explained to Inmate Basket that the medical staff would be called, however he would first have to secure himself in his cell. Plaintiff had this conversation with Inmate Basket both prior to the arrival of Defendant Cpt. Carden and while she was present.

82.     Both Plaintiff and Defendant Cpt. Carden exited the tier and Plaintiff picked up her work bag off the tray cart, as Plaintiff's shift was over.

83.     Moments later Defendant Cpt. Carden appeared as if she was going to re- enter the tier and instructed Plaintiff to put her bag down.  Plaintiff explained that she needed to go because her shift was over and Plaintiff had a flight to catch.  Plaintiff pointed out to Defendant Cpt. Carden that Sergeant Beckford had just arrived on the 2 West door on duty.

84.     Sgt. Beckford came onto the block and immediately said, "Oh Bonds it's always something with you!" This inappropriate comment was made in front of Officer Picucci and two on the job trainee Officers.

85.     Plaintiff then attempted to explain to Sgt. Beckford that Plaintiff had a flight to catch and at that point was cut off by Sgt. Beckford, mid-sentence, who addressed Plaintiff in a hostile voice and stated  "That don't got nothing to do with me!"

86.     Plaintiff then looked back to Defendant Cpt. Carden who instructed Plaintiff to go to the Shift Commander. Plaintiff responded that she would, went to the jail tac room, and walked into Captain Omess' office.

87.     When Plaintiff entered Captain Omess' Office, he appeared to already be bombarded with another incident taking place and he appeared upset so Plaintiff exited the office.

88.     Plaintiff began to put her belongings in her bus locker while watching 2 West on the monitor screen in the tac room. As Plaintiff finished putting her belongings away, Plaintiff noticed there was no longer anyone on the 2 West tier.

89.     Plaintiff called upstairs and asked to speak with Sgt Beckford, and confirmed that everything was in order.  Sgt. Beckford stated to Plaintiff that the inmate was locked in and that there was only paperwork to be done at this time.

90.     Plaintiff then went into Captain Omess' office and told him that the inmate was secured and that Sgt. Beckford was handling it. Plaintiff made this statement to Captain Omess only after Plaintiff had confirmation that the block was secured.

91.     As such, the formal counseling Defendant Cpt. Carden issued to Plaintiff was based on false assumptions and a third party conversation about regarding Plaintiff, not on the actual fact

-18-

that occurred on November 8, 2017. Plaintiff explained to Defendant Cpt. Carden in entirety what had occurred and said Defendant herself admitted she was unaware of the entirety of the circumstances, yet Defendant Carden would not resined the wrongful discipline.

92.     In fact, when Plaintiff asked Defendant Cpt. Carden, if possible,  if the discipline could at least be dropped to a verbal counseling, and Defendant Cpt. Carden informed Plaintiff, "No. They won't do it." When asked who are 'they', Defendant Cpt. Carden responded, "out front."

93.     Plaintiff wrote a rebuttal to the wrongfully issued discipline regarding the November 8, 2017 incident which was never addressed by Defendants.

94.     In or about January 2018, Defendant Warden Moccio ordered Defendant Cpt. Van Lierop to issue a formal written discipline to Plaintiff for Plaintiff's hair allegedly being too long. Said discipline was wrongfully issued as Plaintiff singled out by Defendants regarding her hair length.  In fact, prior to receiving said discipline Plaintiff had her hair cut twice in a week and even took her uniform to the hair salon to ensure her hair did not touch the collar of her uniform.

95.     Defendant Cpt. Van Lierop informed Plaintiff, "Bonds I'm going to have to give you a formal because of your hair." When Plaintiff responded "What? I cut my hair twice and you know that." Defendant Cpt. Van Lierop stated, "I know but they want me to do a formal, just write a rebuttal."

96.     No other Corrections Officers was required to get their hair cut or received discipline for having their hair touch their collar.  In fact, there were numerous Corrections Officers in January 2018, whose hair went past their collar but were not required to have their hair cut and did not receive any form of discipline.  Plaintiff was singled out for the enforcement of this particular regulation regarding hair length as another form of retaliation and further creation of a hostile work

environment.

97.     On or about January 30, 2018, Plaintiff submitted a rebuttal to the formal discipline regarding Plaintiff's hair length to Defendants.  Defendants never addressed Plaintiffs' rebuttal.

98.     On or about May 11, 2018, Plaintiff was sent, by Defendants to have an IME, specifically an audiologist exam.  Said exam was conducted by Defendant Berkower at the request of Defendant County Executive Latimer, as indicated in Defendant Berkower's official written report.

99.     Plaintiff was required to undergo the IME and Defendants had sole control over the selection of the doctor to conducted the IME.

100.    Plaintiff was sent for the audiologist exam as a result of Plaintiff submitting medical documentation from her audiologist requesting a reasonable accommodation due to Plaintiff's hearing impairment.

101.     Defendants failed to have Plaintiff's IME conducted by an audiologist but rather selected an Ears, Nose and Throat (herein "ENT") doctor to conducted the IME, Dr. Berkower, who was wholly unqualified to treat a patient with a hearing impairment, such as Plaintiff.

102.    Plaintiff's audiologist evaluation by Dr. Berkower was not conducted in a conducive environment for a hearing test. For example, but not limited to, Plaintiff's hearing test was conducted by a medical assistant, not an certified audiologist, in and open room with individuals coming in and out and phones ringing, rather than in a sound proof booth.

103.    Dr. Berkower and the medical assistant insisted on Plaintiff removing her hearing aids, which was impossible because the removal is a quasi-surgical procedure that requires an audiologist.  Dr. Berkower admitted to Plaintiff that he had no knowledge of her hearing aids

because he is an ENT not an audiologist.

104.    Plaintiff sent an email on May 11, 2018, informing both Mr. Donnelley, the Union President and Attorney Warren Roth, the Union Attorney, about the invalid and ridiculous IME to which she was subjected by Defendants.

105.    Based on information and belief, Defendants County, Corrections and County Executive Latimer knowingly sent Plaintiff to an ENT rather than an audiologist, whom Defendants colluded with, Defendant Dr. Berkower, to ensure that the IME report provided would find Plaintiff unfit for duty.

106.    In Defendant Dr. Berkower's IME report dated May 11, 2018, he states that Plaintiff's hearing impairment in non-job related, yet notes that there is no history of hearing impairment in Plaintiff's family and that Plaintiff was exposed from 2003 through 2014 to job related loud noises.

107.    Defendant Dr. Berkower also repeated at least twice in his May 11, 2018 IME report of Plaintiff, that Plaintiff "refused" to remove her hearing aids. Said statements are evidence of Dr. Berkower's apparent being unqualified and his disingenuousness in reporting his findings as Dr. Berkower knew for certain that an Audiologist was required to remove Plaintiff's hearing aids, and not even Dr. Berkower had the knowledge of how to remove said hearing aids.

108.    On or about May 31 2018, Plaintiff was served a formal letter to her house by two of Defendant Corrections' Sergeants from Defendant Joseph Spano placing Plaintiff on an involuntary leave of absence pursuant to Section 72.5 of New York State Civil Service Law. Defendants used Defendant Dr. Berkower's flawed IME exam and report to justify said involuntary suspension.

-21-

109.    Defendant Spano also, in the May 31, 2018 letter directed Plaintiff to surrender her shield, body alarm and all other County-issued items in her possession, while also informing Plaintiff she must undergo another IME, the time, place and doctor at the Defendants discretion and that the IME could result in termination.

110.    Based on information and belief, Defendants purposefully delayed Plaintiff's IME so that Plaintiff would be force to be suspended without pay for longer than necessary.

111.    On or about June 5, 2018 Plaintiff amended her EEOC Complaint to include retaliation and also included that fact that Plaintiff had identified two positions that would have accommodated Plaintiff's disability but Defendants refused to transfer Plaintiff to said posts.

112.    Shortly after Plaintiff amended her EEOC Complaint, Attorney Warren Roth called Plaintiff and stated that Plaintiff must withdraw her EEOC complaints because Plaintiff was upsetting Defendant Corrections.  Attorney Roth further stated to Plaintiff that he strongly suggests Plaintiff withdraw the EEOC Complaints if Plaintiff wants to be accommodated.

113.    Ultimately, Plaintiff was seen by two of her own medical doctors and another medical doctor selected by Defendants.  All of the medical doctors concurred that Plaintiff could return to work with hearing aids.

114.    Plaintiff returned to work approximately the second week of June 2018, still without a reasonable accommodation.

115.    Within the same week of returning to work, Union President Bruce Donnelley informed Plaintiff that Defendants were now going to file disciplinary charges against Plaintiff for all the baseless formal counselings Plaintiff had received since first requesting a reasonable accommodation in 2017 from Defendant Diaz (now Commissioner Diaz). These formal counselings

were the exact disciplinary actions that Plaintiff had complained to the EEOC about as retaliation

to Plaintiff's request for a reasonable accommodation and opposing discrimination.

116.    Since returning to work in June 2018 from the involuntary leave of absence Plaintiff

continues to receive formal discipline for the slightest alleged infractions unlike other Corrections

Officer who have not requested a reasonable accommodation based on a disability.

117.    Plaintiff has requested that Defendant Cpt. Carden reduce the formal disciplines to

a verbal discipline on a number of occasions to which Defendant Cpt. Carden continually respond

no "out front will not allow her".

118.    Plaintiff has been totally humiliated because now inmates, officers, majority of all

staff are aware of Plaintiff's hearing impairment due to Plaintiff being placed on the involuntary

leave of absence.

119.    Union President Bruce Donnelley informed Plaintiff that no one was ever place on

involuntary leave pending a medical exam without pay at Defendant Corrections and that Plaintiff

was clearly singled out for such treatment.

120.    An example of the ridiculous write-ups and unequal disciplines Plaintiff received

and has been receiving, including but in not limited to Captain Robert Slensby's written formal

discipline against Plaintiff for not putting paper clips on papers on one occasion. Said order to issue

the disciplines was at the direction of Warden Camera.

## AS AND FOR A FIRST COUNT
## 42 U.S.C. § 12101(e) - AMERICANS WITH DISABILITIES ACT
## (*AS AMENDED*) ("ADAA") the Rehabilitation Act, 29 U.S.C. §794

121.    Plaintiff repeats, reiterates and realleges each and every allegation contained in

paragraphs 1 through 120 of the Complaint with the same force and effect as though fully set forth

herein.

122.    Plaintiff ETONYA BONDS  is an individual with a disability as defined by the ADAA (loss of hearing) - a disability as defined under and protected by the Americans with Disabilities Act.

123.    Based on information and belief Defendants County and Corrections receives federal funding within the context of the Rehabilitation Act, 29 U.S.C. §794.

124.    Plaintiff repeatedly sought a reasonable accommodation, to be transferred to an administrative position, away from the repetitive loud noises of the cell block, based on Plaintiff's hearing impairment and the Defendants repeatedly refused to provide Plaintiff with a reasonable accommodation.

125.    Plaintiff first requested a reasonable accommodation in January 2017 by verbally informing Defendant Diaz that Plaintiff needed to work in a quieter environment such as an administrative office, due to Plaintiff's hearing impairment.

126.    Plaintiff made a request for a reasonable accommodation for a TTY telephone to help Plaintiff with the use of the telephone because of Plaintiff's hearing impairment.  Defendants denied Plaintiff's reasonable accommodation for a TTY telephone.

127.    Once Plaintiff requested her reasonable accommodations and provided the required medical note from her doctor for the reasonable accommodations, Defendants commenced a campaign of harassment and retaliation against Plaintiff including but not limited to  over scrutinization of Plaintiff's work, subjecting Plaintiff to formal disciplines that were not warranted and assigning Plaintiff to a work environment known to negatively impact Plaintiff's hearing impairment.

128.    Plaintiff filed a formal Complaint with the EEOC for discrimination based on disability on or about May 19, 2017 and an Amended Charge of Discrimination for retaliation and discrimination based on disability on or about June 5, 2018.

129.    Defendant County Executive Latimer demanded that Plaintiff undergo a medical examination for Plaintiff's hearing impairment and selected Defendant Dr. Berkower as the doctor to conduct the IME as noted in Dr. Berkower's medical report.

130.    Defendant Dr. Berkower was not qualified to conduct the IME of Plaintiff regarding her hearing, however, Dr. Berkower conducted the IME and submitted to reporting knowing that he was not qualified as an Audiologist.

131.    Defendants used Dr. Berkower's flawed report as the basis for forcing Plaintiff onto an involuntary leave without pay and to turn over her shield until another medical exam could be conducted.  Defendants delayed the medical exam to punish Plaintiff for filing her complaint with the EEOC alleging disability discrimination and failure to provide a reasonable accommodation.

132.    The above discriminatory practices based on Plaintiff's disability, by the Defendants, all of them, their agents and employees violates the Americans with Disabilities Act, 42 U.S.C. §12101(e).

133.    As a direct result of said acts Plaintiff has suffered a loss of income, injury to her career, and has suffered and continues to suffer distress, damage to her physical health, humiliation, embarrassment, great financial expense and severe damage to her reputation.

134.    The acts of Defendants complained of herein were willful, wanton, malicious and oppressive.  They acted with callous disregard, recklessness and deliberate indifference toward the rights of the Plaintiff and without concern for the damage they would cause.  Defendants' acts were

-25-

motivated by a desire to not accommodate Plaintiff's medical needs without regard for Plaintiff's

well-being, and were based on a lack of concern and ill will towards Plaintiff and for her opposing

the wrongful treatment.

135.    As a result of Defendants' acts, Plaintiff suffered and is entitled to damages sustained

to date and continuing, including compensatory damages, costs, attorneys' fees, additional monetary

losses, in the amount of five million ($5,000,000.00) dollars, and punitive damages in an amount to

be determined at trial.

**AS AND FOR A SECOND COUNT**
**TITLE VII, CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e**

136.    Plaintiff repeats and reiterates the allegations set forth in paragraph 1 through 135

inclusive of this Complaint, with the same force and effect as though herein fully set forth herein.

137.    The Defendants, in particular all named Individual Defendants discriminated against

Plaintiff in her employment based on Plaintiff's disability and in retaliation for requesting a

reasonable accommodation based on Plaintiff's hearing impairment, in violation of Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000(e), as amended.

138.    The discriminatory acts and conduct of the aforesaid Defendants, including but not

limited to Defendants' repeated failure to provide Plaintiff with a reasonable accommodation,

condoning harassment, and subjecting Plaintiff to unequal terms and conditions of employment vis-

a-vis unequal discipline, as alleged above, were acts committed by the Defendants, as part of a single

discriminatory policy and practice, which began in January 2017, and continues.

139.    Upon information and belief, Plaintiff's similarly situated colleagues received were

not subjected to the same level of scrutiny, singled out for evaluations, subjected to same level of

-26-

discipline, sent to unqualified doctors for IMEs, wrongfully placed on involuntary leave, and retaliated against by the Defendants, unlike Plaintiff who requested a reasonable accommodation and is hearing impaired.

140.    As a direct result of said acts, Plaintiff has suffered a loss of income, has suffered continued hearing loss, and continues to suffer distress, humiliation, embarrassment, great financial expense and damage to her reputation.

141.    Defendants violated public policy in discriminating against Plaintiff because of her disability, need for a reasonable accommodation and in retaliation for requesting a reasonable accommodation and opposing the wrongful treatment.

142.    The acts of Defendants complained of herein were willful, wanton, malicious and oppressive.  They acted with callous disregard, recklessness and deliberate indifference toward the rights of the Plaintiff and without concern for the damage they would cause.  Defendants' acts were motivated by a desire to not accommodate Plaintiff's medical needs without regard for Plaintiff's well-being, and were based on a lack of concern and ill will towards Plaintiff and for her opposing the wrongful treatment.

143.    As a result of Defendants' acts, Plaintiff suffered and is entitled to damages sustained to date and continuing, including compensatory damages, costs, attorneys' fees, additional monetary losses, in the amount of five million ($5,000,000.00) dollars, and punitive damages in an amount to be determined at trial.

## AS AND FOR THE THIRD COUNT
### 42 U.S.C. §1983 - FOURTEENTH AMENDMENT & CONSPIRACY

144.    Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 143 inclusive of this complaint, with the same force and effect as though herein fully set forth.

145.    The Defendants have engaged in actions and abuses which violate and deny Plaintiff her rights as provided under the Fourteenth Amendment of the United States Constitution violating her Fourteenth Amendment rights of equal protection and substantive due process in discriminating against Plaintiff because of and account of her disability and in retaliation for opposing discrimination based on disability.

146.    Defendants' infringement upon and violation of Plaintiff's rights protected under the Fourteenth Amendment of the United States Constitution was and is intended to place a chilling effect upon the exercise of such rights by Plaintiff and other persons as is their right as provided by the U.S. Constitution and exercise such rights.

147.    Plaintiff, a female with a hearing disability, has been treated differently from similarly situated employees without disabilities and has been abused and violated because of her disability.

148.    Defendants' acts has caused the Plaintiff to suffer unwarranted discipline, loss of income, humiliation and continued loss of hearing, and has resulted in diminishing her ability to advancement in her employment.

149.    Defendants knew that they were discriminating against and violating Plaintiff's rights and conspired one with another to so discriminate because of hearing impairment and request for a reasonable accommodation. Specifically, Defendants, including Defendant Latimer, hired Defendant

Dr. Berkower, who was unqualified to conduct an IME, and ensured that the report from Dr. Berkower would falsely provide a basis to subject Plaintiff to an involuntary leave and possible termination. Defendant Spano conspired with Defendants Latimer and Pruyne, as well as Defendant Dr. Berkower to subject Plaintiff to an unwarranted involuntary leave of absence with the goal of laying the foundation for the wrongful termination of Plaintiff.   In so acting, Defendants Office through their agents and employees, took actions in violation of Plaintiff's rights which they knew or should have known were within and outside the scope of their authority.

150.    Furthermore Defendant Wardens Moccio and Diaz directed and instructed Defendant Captains Yankowski, Smiley, Thomalen and Van Lierop to overly scrutinize Plaintiff's work and write formal disciplinary actions against Plaintiff that were not warranted to lay a foundation to ultimately terminate Plaintiff and create a hostile work environment.

151.    Defendant Diaz directed Defendant Smiley to single Plaintiff out for a written evaluation and based on information and belief, instructed Defendant Smiley to give Plaintiff a poor evaluation.

152.    The Defendant took no action to prevent the wrongful actions taken against Plaintiff to discriminate against her and cause her employment to be wrongfully diminished.

153.    Defendant acquiesced and contributed to the continuation of the conspiracy to violate Plaintiff's rights in failing to take action as to prevent and expose the discriminatory and violative actions being taken against Plaintiff.

154.    The Defendants condoned the wrongful, discriminatory, reckless, careless and intentional acts taken as set out herein and each had an affirmative responsibility to prevent, expose and reverse said wrongful, discriminatory, reckless, careless and intentional acts but instead joined

in this conspiracy against Plaintiff because of her disability and in retaliation for requesting a reasonable accommodation.

155.    As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer diminished employment, loss of income,, and has suffered and continues to suffer increasing hearing loss, distress, humiliation, great expense, embarrassment, and damage to her reputation.

156.    As a result of Defendants' acts, Plaintiff suffered and is entitled to, damages sustained to date and continuing in excess of five million dollars ($5,000,000.00), as well as punitive damages, costs and attorney's fees.

### AS AND FOR A FOURTH COUNT
### 42 U.S.C. §1983 - MUNICIPAL VIOLATIONS

157.    Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 155 inclusive, of this Complaint, with the same force and effect as though herein fully set forth.

158.    Defendant County and Corrections acting under color of law, and through their employees servants, agents and designees, have engaged in a course of action and behavior rising to the level of a policy, custom, and condoned practice, in abusing the rights and discriminating against persons situated as Plaintiff is which has deprived Plaintiff of rights, privileges and immunities secured by the Constitution and laws in violation of 42 U.S.C. §1983. These actions were condoned, adopted and fostered by policy makers of Defendants.

159.    Further, Defendants County and Corrections had failed to investigate any of Plaintiff's complaints regarding the discriminatory and harassing treatment by Plaintiff's superiors in the workplace.

160.    As a direct and proximate result of said acts, Plaintiff suffered and continues to suffer

-30-

diminished employment, loss of income, loss of other employment benefits, and has suffered and continues to suffer distress, humiliation, great expense, embarrassment, and damages to his reputation.

161.     As a result of Defendants acts, Plaintiff suffered, and is entitled to, damages sustained to date and continuing in excess of five million dollars ($5,000,000.00), costs and attorney's fees as well as equitable and injunctive relief and any other relief this Court may find and just and proper.

## PRAYER FOR RELIEF

Plaintiff requests that he receive judgment as follows:

a.     First Cause of Action:  in excess of $5,000,000 in compensatory damages, punitive damages, costs and attorney's fees;

b.     Second Cause of Action: in excess of $5,000,000 in compensatory damages, punitive damages, costs and attorney's fees;

c.     Third Cause of Action:  in excess of $5,000,000 in compensatory damages, punitive damages, costs and attorney's fees;

d.     Fourth Cause of Action:  in excess of $5,000,000 in compensatory damages, punitive damages, costs and attorney's fees;

e.     A Declaratory Judgment that Defendants wilfully violated Plaintiff's rights secured by federal and state law as alleged herein;

f.     Injunctive relief, requiring Defendants to correct all past violations of federal law as alleged herein; to grant Plaintiff the degree and employment that Defendants' illegal actions prevented her from securing; to enjoin Defendants from continuing to act in violation of federal law and other laws as alleged herein; and to order such other injunctive relief as may be appropriate to prevent any future violations of said federal laws;

g.     An order granting such other legal and equitable relief as the court deems just and proper.

## PLAINTIFF DEMANDS A TRIAL BY JURY

Dated: Hempstead, New York
      February 24, 2019

                                          Respectfully submitted,

                                          THE LAW OFFICES OF
                                          FREDERICK K. BREWINGTON

By:                 _/S/_____

                                          FREDERICK K. BREWINGTON
                                          CATHRYN HARRIS-MARCHESI
                                          *Attorney(s) for Plaintiff*
                                          556 Peninsula Boulevard
                                          Hempstead, New York 11550
                                          (516) 489-6959

# EXHIBIT A



RECEIVED

NOV 2 6 2018

U.S. Department of Justice
Civil Rights Division
NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

CERTIFIED MAIL
7003 0500 0002 5071 9482 LAW OFFICES OF
FREDERICK K. BREWINGTON

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson , EMP, PHB, Room 4701*
*Washington, DC 20530*

November 15, 2018

Ms. Etonya Bonds
c/o Cathryn Harris Marchesi, Esquire
Law Offices of Frederick K. Brewington
556 Peninsula Blvd.
Hempstead, NY 11550

Re: EEOC Charge Against Westchester Dept. of Corrections
No. 520201702370

Dear Ms. Bonds:

Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action against the above-named respondent under: Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. 12111, et seq., and, Title V, Section 503 of the Act, 42 U.S.C. 12203.

If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

The investigative file pertaining to your case is located in the EEOC New York District Office, New York, NY.

This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

Sincerely,

Eric S. Dreiband
Assistant Attorney General
Civil Rights Division

by *Karen L. Ferguson*
Karen L. Ferguson
Supervisory Civil Rights Analyst
Employment Litigation Section

cc: New York District Office, EEOC
Westchester Dept. of Corrections

U.S. Department of Justice

CIVIL RIGHTS-EMP-LIT

Washington, D.C. 20530

Official Business
Penalty for Private Use $300

7003 0500 0002 5071 9487

RETURN RECEIPT
REQUESTED

US OFFICIAL MAIL
$300 Penalty
For Private Use

$06.670
11/20/2018
Mailed From 20530
US POSTAGE

Hasler