UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ETONYA BONDS,

                              Plaintiff,

              v.

COUNTY OF WESTCHESTER, *et al*.,

                              Defendants.

No. 19-CV-1712 (KMK)

OPINION & ORDER

Appearances:

Cathryn A. Harris-Marchesi, Esq.
Tricia S. Lindsay, Esq.
Frederick K. Brewington, Esq.
Law Offices of Frederick K. Brewington
Hempstead, NY
*Counsel for Plaintiff*

Loren Zeitler, Esq.
Westchester County Dep't of Law
White Plains, NY
*Counsel for County Defendants*

Andrew I. Hamelsky, Esq.
Jennifer A. Scarcella, Esq.
White & Williams, LLP
New York, NY
*Counsel for Defendant Berkower*

KENNETH M. KARAS, United States District Judge:

      Plaintiff Etonya Bonds ("Plaintiff") brings this Action against Defendants Westchester

County ("Westchester" or "the County"), Westchester County Department of Corrections

("WCDOC"), Commissioner of Corrections Joseph Spano ("Spano"), Deputy Commissioner

Justin Pruyne ("Pruyne"), Warden Leandor Diaz ("Diaz"), Warden Walter Moccio ("Moccio"),

Captain Steven Yankowski ("Yankowski"), Captain Wendell Smiley ("Smiley"), Captain Chris

Thomalen ("Thomalen"), Captain Shivaun Carden ("Carden"), Captain Van Lierop ("Lierop"), Dr. Alan S. Berkower ("Berkower"), and ten unnamed WCDOC employees,[1] pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 122101 *et seq.*, § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and 42 U.S.C. § 1983 and the Fourteenth Amendment.  (*See generally* Am. Compl. (Dkt. No. 47).)  Before the Court are two Motions To Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6): one filed by Berkower ("the Berkower Motion"), (Berkower Not. of Mot. (Dkt. No. 58)), and one filed by the County Defendants ("the County Motion"), (Cty. Not. of Mot. (Dkt. No. 68)).  For the following reasons, the Berkover Motion is granted and the County Motion is granted in part and denied in part.

## I.  Background

### A.  Factual Background

The following factual allegation are drawn from the Amended Complaint and taken as true for the purposes of the instant Motions.

Plaintiff has been employed as a Correction Officer ("C.O.") by WCDOC for more than fifteen years and currently holds the rank of sergeant.  (Am. Compl. ¶ 23.)  Plaintiff has difficulty hearing and therefore wears hearing aids that require a quasi-surgical procedure to be removed.  (*Id.* ¶ 25.)  Over the course of her career with WCDOC, Plaintiff has always been assigned to work in the cell block, "an environment that consists of constant loud repetitive noises such as, but not limited to the clanging of the jail cell doors, alarms, loud speak[er]s and

---

[1] Collectively, all Defendants except for Berkower are referred to as the "County Defendants."  All County Defendants other than the County and WCDOC (when sued in their individual capacities) are referred to as the "Individual County Defendants" (or, "ICDs").  Together, Berkower and the ICDs are referred to as the "Individual Defendants."

radios." (*Id.* ¶ 24.)  Plaintiff believes that these noises have "negatively impacted and continue to negatively impact Plaintiff's ability to hear."  (*Id.* ¶ 26.)

In or about January 2017, Plaintiff spoke with Diaz and requested reassignment to "an administrative position away from the loud, repetitive noises in the cell block."  (*Id.*)  Diaz "stated to Plaintiff that he was aware and concerned about her hearing impairment," but he nevertheless explained that "there was nowhere to place Plaintiff."  (*Id.* ¶¶ 28–29.)  However, "Plaintiff was aware of approximately four open positions in administration for a correction officer to fill."  (*Id.*)  Plaintiff also alleges that "Defendants frequently provided transfers to other positions for correction officer[s] or even created positions for other officers" who "did not suffer from specified medical needs."  (*Id.* ¶ 30.)  Prior to this January 2017 request to Diaz for a reassignment, Plaintiff had "never [been] suspended or docke[d] pay or received any written discipline in [her] fifteen plus year career" at WCDOC.  (*Id.* ¶ 31.)

On April 8, 2017, Plaintiff was "assigned as [s]ector [s]ergeant for the Old Jail."  (*Id.* ¶ 32.)  At the time, the Old Jail consisted of two tiers and housed 28 inmates, all of whom suffered from mental illness.  (*Id.* ¶ 33.)  As sector sergeant, Plaintiff was responsible for "filling out" reports about inmate incidents that resulted in C.O. uses of force ("use of force packets").  (*Id.* ¶ 34.)  On April 8, 2017, "three inmate incidents occurred simultaneously that required Plaintiff's immediate attention: 1) Plaintiff was splashed with bodily fluids of an inmate; 2) several [C.O.s] were . . . splashed with urine and feces from multiple inmates; and 3) [] an inmate attempted suicide."  (*Id.* ¶ 32.)  Plaintiff thus had the responsibility of completing three "use of force packets," each of which required substantial paperwork.  (*Id.* ¶¶ 34–35.)  Plaintiff alleges that she was unfairly "harassed and targeted by her [c]aptains to finish the paperwork regarding the incidents in an unreasonable amount of time."  (*Id.* ¶ 36.)

At some point thereafter, Plaintiff alleges that "the Warden" ordered Captain Marble ("Marble") to issue Plaintiff "a formal written discipline";[2] however, Marble delivered "a verbal counseling instead." (*Id.* ¶ 37.) On or about May 11, 2017, Plaintiff informed Smiley that "she was being harassed and unfairly targeted by her superiors," and provided him with "specific examples of such harassment." (*Id.* ¶ 38.) In particular, Plaintiff described the April 8, 2017 incident and "the amount of paperwork Plaintiff was expected to finish in a short period of time." (*Id.* ¶ 39.) Smiley responded by telling Plaintiff, "just do your job." (*Id.* ¶ 40.) Smiley did not "conduct any investigation into Plaintiff's complaint." (*Id.* ¶ 41.)

On or about May 19, 2017, Plaintiff was assigned to "second response," a role that, Plaintiff alleges, "her disability prevented [her] from being able to fulfill." (*Id.* ¶ 42.) Plaintiff had previously provided a medical note regarding her inability to perform this role, and she reminded Thomalen of this medical restriction. (*Id.* ¶¶ 42–43.) Nevertheless, "Plaintiff was informed that a new medical note was required from Plaintiff's doctor because the one she had previously provided 'expired.'" (*Id.* ¶ 44.) Plaintiff informed Thomalen that she would call her doctor and ask him to fax a new medical note. (*Id.*) However, Thomalen "became irate toward Plaintiff," and shouted at Plaintiff in front of her colleagues. (*Id.* ¶ 45.) Thomalen then "reluctantly" provided Plaintiff with an alternative assignment. (*Id.* ¶ 46.) About two hours later, however, "at the Warden's briefing," Thomalen abruptly ordered Plaintiff to return home. (*Id.* ¶¶ 47–48.) Plaintiff soon discovered that Diaz had instructed Thomalen to send her home, so she explained to Diaz that a "note would be arriving once [her] doctor got into his office that very same morning." (*Id.* ¶¶ 49–50.) Nevertheless, Diaz insisted that Plaintiff return home. (*Id.* ¶ 50.) Plaintiff further alleges that other sergeants, such as Roy Omess ("Omess"), were "not

---

[2] While Plaintiff refers to "the Warden," is not clear whether she means Diaz or Moccio.

required to provide medical documentation to avoid assignment to second response." (*Id.*)
Accordingly, immediately after leaving work on May 19, 2017, Plaintiff proceeded directly to
the offices of the Equal Employment Opportunity Commission ("EEOC") in New York City and
filed a complaint alleging violations of the ADA by Defendants. (*Id.* ¶ 51.)

At some point before July 17, 2017, an incident occurred involving "a mentally unstable
inmate who was in no condition to provide a written or verbal statement due to [his] medical and
mental state at the time of said incident." (*Id.* ¶ 54.) Plaintiff prepared a report about the
incident, which was approved and signed off on by her superior, Captain Adrian Coley
("Coley"). (*Id.*) Nevertheless, on or about July 17, 2017, Plaintiff received formal, written
counseling from Coley, delivered at the direction of Maccio, purportedly for Plaintiff's failure to
obtain a statement from the inmate. (*Id.* ¶¶ 52–54.) However, Plaintiff believes that the
counseling was actually retaliation for Plaintiff filing an EEOC complaint against Diaz and other
Defendants. (*Id.* ¶ 53.) Plaintiff's union representative, Peter Dichiari ("Dichiari"), was present
when Plaintiff was served with the Coley's written counseling. (*Id.* ¶ 57.) At the time, Dichiari
"stated that the discipline would be thrown out or dropped to a verbal counseling, as the write-up
was ludicrous"; nevertheless, the formal counseling was not removed from Plaintiff's record, and
Plaintiff's rebuttal was never addressed or considered. (*Id.*)

Two days later, on or about July 19, 2017, Carden denied Plaintiff's request for overtime
to complete her required paperwork, an unusual occurrence. (*Id.* ¶ 55.) On or about July 24,
2017, Plaintiff again made a formal request for a transfer to an administrative position because of
her hearing impairment. (*Id.* ¶ 56.) At the time, approximately four such positions (for which
Plaintiff believes she was qualified) were open and waiting to be filled. (*Id.*)

On or about August 3, 2017, Plaintiff was "out of work due to an on the job injury;" nevertheless, WCDOC's Special Investigation Department "ordered Plaintiff to return to work for an investigation." (*Id.* ¶ 58.) However, even after Plaintiff completed her part in the investigation, "Defendants tried to make Plaintiff stay and complete a use of force packet, even though Plaintiff was injured and excused from work due to said injury." (*Id.* ¶ 59.) Although Plaintiff had previously attempted to complete the relevant packet before her injury, Carden had "refused to permit Plaintiff" to complete it at that time. (*Id.* ¶ 60.) Plaintiff thus still "owed" the packet to Carden. (*Id.*)

During this period, Diaz approached Plaintiff's superiors and asked if "there was anything you can think to write up Bonds about." (*Id.* ¶ 65.) When Captain Patti Bhola responded "no," Diaz responded, "[a]re you sure you don't have anything?" (*Id.*) Smiley then pulled Plaintiff into his office and informed her that, while he did not know precisely what Defendants were "planning," his superiors had ordered him "to write an evaluation for Plaintiff," but not for any other C.O.s whom he supervised. (*Id.* ¶ 66.) Subsequently, Smiley's superiors reviewed the evaluation he wrote of Plaintiff, and ordered him to change the evaluation twice, ensuring that Plaintiff received a very poor evaluation, which Plaintiff believes was "contrary to [her] actual job performance." (*Id.* ¶ 67.)

On or about August 16, 2017, Yankowski came to Plaintiff's house and hand-delivered Plaintiff's performance evaluation. (*Id.* ¶ 61.) Plaintiff immediately telephoned Bruce Donnelley ("Donnelley"), her union president, to inform him that "Yankowski had just hand delivered her performance evaluation to her home." (*Id.* ¶ 62.) Plaintiff was "not aware of any other [WCDOC employee] who had a performance evaluation hand delivered to their home by a supervisor," and she later confirmed that she was the sole WCDOC employee to receive an

evaluation at this time.  (*Id.* ¶¶ 62, 68.)  Although WCDOC later evaluated some of Plaintiff's

colleagues, it did so only after Plaintiff complained about being singled out.  (*Id.* ¶ 70.)

Plaintiff then returned to the EEOC (this time, in Westchester County) to "make a

complaint of further harassment based on Plaintiff's disability and in retaliation for Plaintiff's

original EEO[C] complaint."  (*Id.* ¶ 63.)  In her complaint, Plaintiff alleged:

> On 8/16/2017 officials from my job have shown up at my home unannounced to
> give me a performance evaluation.  The evaluation was poor in its entirety.  That
> was the absolute last straw[,] and I am experiencing psychological damage for all
> the discrimination, harassment, and stress that job has given me.  I cannot go to my
> union because it is a conflict of interest since they are also representing the people
> who are defaming my character and my work ethics, by bullying, harassing[,] and
> discriminating against me.

(*Id.* ¶ 64.)  "In or about late August 2017, Defendants received Plaintiff's formal EEOC

complaint . . . regarding the July 17 and July 19, 2017 incidents."  (*Id.* ¶ 69.)

When Plaintiff returned to work after her job injury, she did so "with medical

restrictions" and walked with a limp.  (*Id.* ¶ 71.)  Nevertheless, "Defendants refused to assign

Plaintiff to the desk area," and instead "assigned Plaintiff to the worst place in the jail five days a

week, not switching Plaintiff, while every other Sergeant was switched or rotated every two to

three days."  (*Id.*)  Plaintiff complained to Chief Birritella ("Birritella"), who was responsible for

WCDOC equal employment matters; however, "Birritella never followed up with Plaintiff

regarding her discrimination and harassment complaints."  (*Id.* ¶ 72.)

"On or about September 1, 2017, Plaintiff received a certified letter[,] dated August 24,

2017, from . . . Pruyne stating he had been unaware of Plaintiff's hearing disability."  (*Id.* ¶ 73.)

Pruyne further explained that if Plaintiff provided proper medical documentation, he "would be

happy to meet with Plaintiff to discuss a reasonable accommodation."  (*Id.*)  However, Pruyne

"never provided Plaintiff with the reasonable accommodations she required."  (*Id.*)

On November 8, 2017, Plaintiff was assigned as sector supervisor in the Old Jail from 7:00 a.m. to 3:00 p.m.  (*Id.* ¶ 74.)  At approximately 2:35 p.m., Plaintiff was informed that an inmate, Jeru Basket ("Basket"), was lying on a tier floor and "refusing to lock into his cell."  (*Id.* ¶ 75.)  Plaintiff ordered Basket several times to return to his cell, but he refused to comply.  (*Id.* ¶ 76.)  Plaintiff notified Omess, the shift commander, who informed Plaintiff that he would send Carden to the scene for "de-escalation."  (*Id.* ¶¶ 76–77.)  After Carden arrived, Plaintiff informed her of the situation and then repeated (in Carden's presence) her orders to Basket to return to his cell.  (*Id.* ¶ 79.)  Plaintiff further explained to Basket that medical staff would be called, but only after he returned to his cell.  (*Id.* ¶ 80.)  Plaintiff and Carden then "exited the tier and Plaintiff picked up her work bag off the tray cart, as Plaintiff's shift was over."  (*Id.* ¶ 81.)

Moments later, Carden indicated that they should return to the tier, and she instructed Plaintiff to put her bag down.  (*Id.* ¶ 82.)  Plaintiff responded that her shift was over, that she had a flight to catch, and that a "Sergeant Beckford" ("Beckford") had just arrived on duty.  (*Id.*)  When Beckford arrived onto the block, he immediately said (in front of another C.O. and two trainees), "[o]h Bonds[,] it's always something with you!"  (*Id.* ¶ 83.)  Plaintiff attempted to explain to Beckford that she had a flight to catch, but Beckford cut her off mid-sentence, saying "[t]hat don't got nothing to do with me!"  (*Id.* ¶ 84.)  Plaintiff then turned back to Carden, who instructed Plaintiff to go to the shift commander.  (*Id.* ¶ 85.)  Plaintiff responded that she would do so, and she proceeded to Omess' office.  (*Id.*)  When Plaintiff arrived, Omess appeared involved in, and upset about, another incident, so Plaintiff exited his office.  (*Id.* ¶ 86.)

Plaintiff began to place her belongings in her locker while watching the "2 West" tier on a monitor.  (*Id.* ¶ 87.)  Plaintiff noticed there was no longer anyone on the 2 West tier, and so she called upstairs and asked to speak with Beckford to "confirm[] that everything was in order."

(*Id.* ¶¶ 87–88.)  Beckford explained that Basket had returned to his cell, and "there was only paperwork to be done at this time."  (*Id.* ¶ 88.)  Plaintiff then returned to Omess' office and told him that Basket was secured and that Beckford was handling the situation.  (*Id.* ¶ 89.) Nevertheless, on or about November 15, 2017 Plaintiff received formal counseling from Carden based on her conduct during the November 8, 2017 incident.  (*Id.* ¶ 74.)  Plaintiff alleges that Carden's counseling "was based on false assumptions and a third party conversation," even though Plaintiff had explained the incident in its entirety to Carden.  (*Id.* ¶ 90.)  However, even though Carden "admitted she was unaware of the entirety of the circumstances," Carden refused to rescind or decrease the discipline, explaining that "out front" would not permit her to do so. (*Id.* ¶¶ 90–91.)  Plaintiff wrote a rebuttal to the discipline for the November 8, 2017 incident, but Defendants never addressed the rebuttal.  (*Id.* ¶ 92.)

In or about January 2018, Moccio ordered Van Lierop to issue Plaintiff a formal written discipline "for Plaintiff's hair allegedly being too long."  (*Id.* ¶ 93.)  However, in the week prior, Plaintiff twice had her hair cut and "even took her uniform to the hair salon to ensure her hair did not touch the collar of her uniform."  (*Id.*)  When Van Lierop told Plaintiff, "Bonds[,] I'm going to have to give you a formal because of your hair," Plaintiff responded, "[w]hat? I cut my hair twice and you know that."  (*Id.* ¶ 94.)  Van Lierop replied, "I know[,] but they want me to do a formal, just write a rebuttal."  (*Id.*)  At the same time, even though there were "numerous" C.O.s whose hair extended past their collars, none was required to have his or her hair cut or received any form of discipline.  (*Id.* ¶ 95.)  On or about January 30, 2018, Plaintiff submitted a rebuttal to the hair-related discipline; however, Defendants never addressed Plaintiffs' rebuttal.  (*Id.* ¶ 96.)

On or about May 11, 2018, after Plaintiff submitted medical documentation from her audiologist in support of her request for an accommodation, Defendants sent Plaintiff to

Berkower to undergo an independent audiology exam.  (*Id.* ¶¶ 97–99.)  Berkower is an ENT rather than audiologist, which Plaintiff believes makes him "wholly unqualified to treat a patient with a hearing impairment."  (*Id.* ¶ 100.)  The exam was conducted "in an[] open room with individuals coming in and out and phones ringing, rather than in a sound[-]proof booth."  (*Id.* ¶ 101.)  Berkower and his medical assistant "insisted on Plaintiff removing her hearing aids, which was impossible because the removal is a quasi-surgical procedure that requires an audiologist."  (*Id.* ¶ 102.)  Berkower also "admitted to Plaintiff that he had no knowledge of her hearing aids because he is an ENT not an audiologist."  (*Id.*)

Berkower's report, dated May 11, 2018, "states that Plaintiff's hearing impairment i[s] non-job related," and "notes that there is no history of hearing impairment in Plaintiff's family and that Plaintiff was exposed from 2003 through 2014 to job related loud noises."  (*Id.* ¶ 105.)  The report also states at least twice that Plaintiff "refused" to remove her hearing aids, even though "Berkower knew for certain that an [a]udiologist was required to remove Plaintiff's hearing aids."  (*Id.* ¶ 106.)  On May 11, 2018, Plaintiff sent an email to Donnelley and union attorney Warren Roth ("Roth"), complaining about the quality of the audiology exam.  (*Id.* ¶ 103.)  Plaintiff further alleges, "[b]ased on information and belief," that WCDOC and Spano "knowingly sent Plaintiff to an ENT rather than an audiologist," and "colluded with" Berkower, to ensure that he "would find Plaintiff unfit for duty."  (*Id.* ¶ 104.)

On or about May 31, 2018, two WCDOC sergeants delivered to Plaintiff's house a formal letter (signed by Spano) placing Plaintiff on an involuntary leave of absence "pursuant to Section 72.5 of New York State Civil Service Law."  (*Id.* ¶ 107.)  The same letter directed Plaintiff to "surrender her shield, body alarm and all other County-issued items in her possession," and informed Plaintiff that she must undergo another independent medical exam at the time, place

and doctor of Defendants' choosing, and that such an exam could result in her termination.  (*Id.* ¶ 108.)  Plaintiff further alleges, "[b]ased on information and belief," that Defendants "purposefully delayed" the exam, so that Plaintiff would "be suspended without pay for longer than necessary."  (*Id.* ¶ 109.)  Additionally, Donnelley informed her that no previous WCDOC employee "was ever place[d] on involuntary leave pending a medical exam without pay."  (*Id.* ¶ 121.)  Plaintiff alleges that she has "been totally humiliated because now inmates, officers, [and the] majority of all staff are aware of Plaintiff's hearing impairment due to Plaintiff being placed on the involuntary leave of absence."  (*Id.* ¶ 120.)

"On or about June 5, 2018, Plaintiff amended her EEOC complaint to include retaliation" and to "identif[y] two positions that would have accommodated Plaintiff's disability" and to which Defendants did not reassign her.  (*Id.* ¶ 110.)  However, "[s]hortly after Plaintiff amended her EEOC Complaint," Roth called Plaintiff, encouraging her to withdraw her EEOC complaints because she was "upsetting" WCDOC, and suggesting that if she withdrew the complaints, her requests for accommodations would be granted.  (*Id.* ¶ 111.)  Ultimately, Plaintiff "was seen by two of her own medical doctors and another medical doctor selected by Defendants," all of whom "concurred that Plaintiff could return to work with hearing aids."  (*Id.* ¶ 112.)

In the second week of June 2018, Plaintiff returned to work, but "without a reasonable accommodation."  (*Id.* ¶ 116.)  Within the week, Donnelley informed Plaintiff that Defendants would soon file disciplinary charges against Plaintiff based on the incidents for which she had previously received counseling.  (*Id.* ¶ 117.)  Moreover, since returning to work in June 2018, "Plaintiff continues to receive formal discipline for the slightest alleged infractions unlike other [C.O.s] who have not requested a reasonable accommodation based on a disability."  (*Id.* ¶ 118.)  For example, Plaintiff describes receiving "write-ups and unequal disciplines" including, a

formal disciplinary notice "for not putting paper clips on papers on one occasion."  (*Id.* ¶ 122.)
Plaintiff further alleges that Spano authorized "unwarranted, and false charges against Plaintiff
on July 1, 2019," stemming from "an incident which occurred with an inmate on or about
January 3, 2018 at the Old Jail 1-K West Corridor."  (*Id.* ¶ 123.)  While "Defendants offered
Plaintiff a Stipulation in Lieu of Charges," Plaintiff alleges that the charges offered to her were
"much more severe than those offered to Sergeant James West ("West") who allegedly used
excessive force against an inmate."  (*Id.* ¶ 125.)  Moreover, the charges against Plaintiff were
based on "whether Plaintiff followed proper de-escalation procedure" immediately following
West's use of force against a non-compliant inmate, despite the fact that her decisions reflected
"a judgement call based on her excess of fifteen years of experience as a Corrections Officer and
. . . her knowledge of the specific inmate."  (*Id.* ¶ 126.)

Based on the foregoing, Plaintiff pursues claims for disability discrimination, failure to
accommodate her disability, retaliation, and a conspiracy to deny her equal treatment based on
her disability.  (*Id.* ¶¶ 127–272.)  Plaintiff seeks over $20,000,000 in damages as well as
injunctive and declaratory relief.  (*Id.* ¶ 272 (a)–(g).)

B.  Procedural Background

Plaintiff filed her initial Complaint on March 13, 2020.  (Dkt. No. 9.)[3]  On June 11, 2019,
the Court held a pre-motion conference, at which Plaintiff elected to amend her complaint and
the Court warned Plaintiff that should her amended complaint be dismissed, dismissal would be

---

[3] Plaintiff appears to have attempted to file her initial complaint on February 24, 2020
(and on several occasions thereafter), but was unable to do so due to repeated filing errors.  (Dkt.
Nos. 1, 5, 7.)

with prejudice.  (*See* Dkt. (minute entry for June 11, 2019).)  On August 12, 2019, Plaintiff filed an Amended Complaint.  (Dkt. No. 47.)[4]

On November 11, 2019, the Court held a second pre-motion conference, at which the Court adopted a briefing schedule for the Berkower Motion and Plaintiff agreed to file a stipulation by November 26, 2019 dismissing some of the claims asserted against the County Defendants.  (*See* Dkt. (minute entry for November 13, 2019).)  The Court further directed that if the County Defendants believed the stipulation was insufficient, they should submit a letter explaining which remaining claims they would move to dismiss.  (*Id.*)

On November 26, 2019, Defendants filed a letter explaining that the Parties had agreed to dismiss: (1) claims asserting a conspiracy "among the County Defendants"; (2) claims naming WCDOC as Defendant; and (3) ADA claims against the Individual Defendants.  (Letter from Loren Zeitler, Esq., to Court (Nov. 26, 2019) ("Nov. 26, 2019 Zeitler Letter") (Dkt. No. 56).)[5] However, because Plaintiff would not agree to dismiss her (1) ADA failure to accommodate claims; (2) claims of a conspiracy between Berkower and the County Defendants; and (3) all § 1983 claims, County Defendants requested permission to file a Motion To Dismiss.  (*Id.*)  On December 2, 2019, the Court granted the request and set a briefing schedule for the County Motion.  (Dkt. No. 57.)

On December 11, 2019, Berkower filed his Motion and accompanying papers.  (Not. of Berkower Mot.; Mem. of Law in Supp. of Berkower Mot. ("Berkower Mem.") (Dkt. No. 59);

---

[4] Plaintiff appears to have again experienced filing difficulties in submitting her Amended Complaint.  (*See* Dkt. Nos. 43, 44, 47.)  Although the repeated filings appear substantively identical, the Court relies on the final such submission.

[5] The Court notes that, despite this agreement and the Court's directive at the November 13, 2019 conference, Plaintiff failed to file any such a stipulation prior to submitting her brief.

Aff. of Jennifer A. Scarcella, Esq. in Supp. of Berkower Mot. ("Scarcella Aff.") (Dkt. No. 60).)

On January 22, 2020, Plaintiff filed her Opposition to the Berkower Motion.  (Pl.'s Mem. in

Opp. to Berkower Mot. ("Pl.'s Berkower Mem.") (Dkt. No. 67).)  On January 24, 2020, the

County Defendants filed their Motion and accompanying papers.  (Not. of Cty. Mot.; Mem. of

Law in Supp. of Cty. Mot. ("Cty. Mem.") (Dkt. No. 70).)  On February 3, 2020, Berkower filed

his Reply.  (Reply Mem. in Supp. of Berkower Mot. ("Berkower Reply Mem.") (Dkt. No. 71).)

On February 24, Plaintiff filed her Opposition to the County Motion.  (Pl.'s Mem. in Opp. to

County Mot. ("Pl.'s Cty. Mem.") (Dkt. No. 72).)  On March 27. 2020, the County Defendants

filed their Reply.  (Reply Mem. in Supp. of Cty. Mot. ("Cty. Reply Mem.") (Dkt. No. 75).)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual

allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

(alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure

"demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft

v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions

devoid of further factual enhancement."  *Id.* (alteration and quotation marks omitted).  Rather, a

complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative

level."  *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be

supported by showing any set of facts consistent with the allegations in the complaint," *id.* at

563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its

face," *id.* at 570, if a plaintiff has not "nudged [his] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

B.  Analysis

As a preliminary matter, the Court notes Plaintiff's stipulation to the dismissal of certain claims.  In particular, Plaintiff consents to the dismissal of all ADA and Rehabilitation Act

claims against the Individual Defendants, (Pl.'s Berkower Mem. 11; Pl.'s Cty. Mem. 12–13),[6] all

claims based on a civil rights conspiracy among the County Defendants, (Pl.'s Cty. Mem 17),[7]

and all claims against WCDOC (*id.* at 21).[8]   Accordingly, these claims are dismissed, and the

Court addresses only the remaining claims.

### 1.  § 1983 Discrimination Claims

As courts have repeatedly observed, "Section 1983 is only a grant of a right of action; the

substantive right giving rise to the action must come from another source."  *Hirsch v. City of*

*New York*, 300 F. Supp. 3d 501, 508 (S.D.N.Y. 2018) (citation and quotation marks omitted); *see*

*also Young v. Suffolk County*, 705 F. Supp. 2d 183, 195 (E.D.N.Y. 2010) ("Section 1983 itself

creates no substantive rights; it provides only a procedure for redress for the deprivation of rights

---

[6] The ADA and Rehabilitation Act assign liability for workplace discrimination only to employers, not individual actors.  *See Perros v. County of Nassau*, 238 F. Supp. 3d 395, 402 n.3 (E.D.N.Y. 2017) (explaining that "it is well-established that there is no individual liability under the ADA or the Rehabilitation Act, whether the individual is sued in their official or individual capacity" (citations omitted)); *Emmons v. City Univ. of N.Y.*, 715 F. Supp. 2d 394, 407 (E.D.N.Y. 2010) (explaining that "individual defendants are not subject to personal liability" under the ADA and Rehabilitation Act (collecting cases)), *order modified*, (July 2, 2010); *see also Spiegel v. Schulmann*, 604 F.3d 72, 79 (2d Cir. 2010) (explaining that even where the ADA's statutory text appears to prohibit individual retaliation, the ADA does not provide for individual liability).

[7] Such claims are also barred by the intracorporate conspiracy doctrine.  *See Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 388 (S.D.N.Y. 2013) (explaining that "officers, agents[,] and employees of a single corporate entity are legally incapable of conspiring together" (quoting *Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d Cir. 2008)).  While the Second Circuit has only expressly recognized the doctrine in the context of conspiracy claims under 42 U.S.C. § 1985, *see Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978), district courts generally assume its applicability to § 1983 suits as well.  *See, e.g.*, *Dowd v. DeMarco*, 314 F. Supp. 3d 576, 587 (S.D.N.Y. 2018) ("[T]his court will continue to apply the intracorporate conspiracy doctrine to Section 1983 claims because the doctrine's logic is sound." (citation and quotation marks omitted)); *Chamberlain*, 986 F. Supp. 2d at 388 (same) (collecting cases).

[8] WCDOC is "not a suable entity."  *Rembert v. Cheverko*, No. 12-CV-9196, 2014 WL 3384629, at *4 n.7 (S.D.N.Y. July 10, 2014); *see also Johnson v. Westchester Cty. Dep't of Corr. Med. Dep't*, No. 10-CV-6309, 2011 WL 2946168, at *3 n.4 (S.D.N.Y. July 19, 2011).

established elsewhere." (citation and quotation marks omitted)).  Here, Plaintiff asserts the

Fourteenth Amendment as the source for her right to be free from employment discrimination on

account of her disability.  (Am. Compl. ¶ 240.)  However, the weight of authority in the Second

Circuit establishes that claims of employment discrimination based on disability are not

cognizable under § 1983.  *See Mejia v. City of New York*, No. 17-CV-2696, 2020 WL 2837008,

at *9 (E.D.N.Y. May 30, 2020) ("[Section] 1983 generally does not provide a cause of action for

disability discrimination."); *Gonzalez v. City of New York*, 377 F. Supp. 3d 273, 288 (S.D.N.Y.

2019) ("Claims of disability discrimination are not actionable under § 1983." (citation omitted));

*Fierro v. N.Y.C. Dep't of Educ.*, 994 F. Supp. 2d 581, 590 (S.D.N.Y. 2014) (explaining that

"freedom from discrimination on the basis of disability is a right secured by statute," rather than

the Fourteenth Amendment (citations omitted)), *Klaes v. Jamestown Bd. of Pub. Utils.*, No. 11-

CV-606, 2013 WL 1337188, at *14 (W.D.N.Y. Mar. 29, 2013) ("[T]his Circuit does not

recognize claims of employment [disability] discrimination or retaliation grounded in the Equal

Protection Clause of the Fourteenth Amendment."); *see also Engquist v. Or. Dep't of Agric.*, 553

U.S. 591, 609 (2008) (rejecting "class-of-one" equal protection claims brought under the

Fourteenth Amendment in the context of public employment); *Bd. of Trs. of Univ. of Ala. v.

Garrett*, 531 U.S. 356, 368, (2001) ("If special accommodations for the disabled are to be

required, they have to come from positive law and not through the Equal Protection Clause.");

*Chick v. County of Suffolk*, 546 F. App'x 58, 60 (2d Cir. 2013) (explaining that dismissal of a §

1983 disability discrimination claim was proper because "disability is not a suspect classification

under the Equal Protection Clause," and because "class of one" claims "do[] not exist in the

public employment context" (citations omitted)).  Accordingly, Plaintiff's § 1983 claims for

disability discrimination (including her *Monell* claims) must be dismissed.  *See Fierro*, 994 F.

Supp. 2d at 589 (dismissing "disability-based discrimination claims" as "not cognizable under § 1983").

### 2.  § 1983 Conspiracy Claims

To state a § 1983 conspiracy claim against a private actor, a complaint "must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act."  *Ciambriello v. County of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002). Conclusory allegations of such a conspiracy are, of course, insufficient.  *Id.* at 325 (explaining that a plaintiff's conspiracy allegations were "strictly conclusory" and must be dismissed).  In particular, "[a] plaintiff must allege facts that plausibly suggest a meeting of the minds and provide some details of time and place."  *Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 728 (S.D.N.Y. 2012) (citation and quotation marks omitted).  Moreover, "absent an underlying constitutional violation on which to base a § 1983 conspiracy claim, a plaintiff's conspiracy claim fails as a matter of law."  *Id.*

Here, Plaintiff alleges that Berkower conspired with the County Defendants to deprive Plaintiff of her "Fourteenth Amendment rights of equal protection and substantive due process in discriminating against her for opposing discrimination based on disability."  (Am. Comp. ¶ 239.) Plaintiff's claims fail for two reasons.  First, as already discussed, "disability-based discrimination claims are not cognizable under § 1983."  *Fierro*, 994 F. Supp. 2d at 589. Accordingly, as Plaintiff's conspiracy claims are based on underlying claims of disability discrimination in violation of the Fourteenth Amendment, these claims must be dismissed for lack of an "underlying constitutional violation."  *Davis v. Whillheim*, No. 17-CV-5793, 2019 WL 935214, at *15 (S.D.N.Y. Feb. 26, 2019) (citing *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001)).  Second, Plaintiff's claim of conspiracy is based on conjecture rather than facts.

Plaintiff's factual allegations regarding Berkower are simply these: that Defendants selected Berkower to conduct Plaintiff's audiology exam, (Am. Compl. ¶¶ 97–99), that Berkower is an ENT rather than audiologist, (*id.* ¶ 100), that the hearing test was conducted "by a medical assistant" in a noisy room, (*id.* ¶ 101), that Berkower and his medical assistant did not understand (or did not agree with Plaintiff's understanding of) the proper removal procedure for Plaintiff's hearing aids, (*id.* ¶ 102), and that Berkower's report concluded that Plaintiff's hearing impairment was "non-job related" and found her "unfit for duty," (*id.* ¶¶ 104–05). Plaintiff further alleges that three other doctors later concluded "that Plaintiff could return to work with hearing aids." (*Id.* ¶ 112.) Based on these allegations alone, Plaintiff *infers* that it is "more than likely" that Berkower's report was prepared in bad faith and "based on directions he received from Defendants." (*Id.* ¶ 258.) This is less an inference than a theory, and is plainly insufficient to establish a civil rights conspiracy. *See Ortiz v. Ledbetter*, No. 19-CV-2493, 2020 WL 2614771, at *6 (S.D.N.Y. May 22, 2020) ("A plaintiff must allege facts that plausibly suggest a meeting of the minds and provide some details of time and place."); *Harrell v. New York State Dep't of Corr. & Cmty. Supervision*, No. 15-CV-7065, 2019 WL 3817190, at *3 (S.D.N.Y. Aug. 14, 2019) (rejecting a plaintiff's assertion that a conspiracy was "readily apparent" from sparse facts). Plaintiff's conspiracy claims are therefore dismissed.

### 3.  ADA Disparate Treatment Claims

Discrimination and retaliation claims under the ADA are generally analyzed under the burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013); *Thompson v. City of New York*, No. 03-CV-4182, 2007 WL 4224370, at *4 (S.D.N.Y. Nov. 21, 2007) ("Retaliation claims under the ADA are analyzed using the same framework

applied in Title VII cases." (citing *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001))), *adopted by* 2008 WL 294290 (S.D.N.Y. Feb. 1, 2008), *aff'd sub nom. Thompson v. N.Y.C. Dep't of Prob.*, 348 F. App'x 643 (2d Cir. 2009).[9]  Under this test, a plaintiff need only initially establish a prima facie case of disability discrimination.  *McMillan*, 711 F.3d at 125.  To do so, a plaintiff must demonstrate that: "(1) [her] employer is subject to the ADA; (2) [she] was disabled within the meaning of the ADA; (3) [she] was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) [she] suffered adverse employment action because of [her] disability."  *Id.* at 125–26 (citation omitted).[10]  If an employee establishes a prima facie case of discrimination, the burden shifts to the defendant-employer, who may rebut the employee's claim with legitimate, non-discriminatory reasons for the adverse employment action.  *See Sattar v. Johnson*, 129 F. Supp. 3d 123, 137 (S.D.N.Y. 2015) (collecting cases), *aff'd sub nom. Sattar v. Dep't of Homeland Sec.*, 669 F. App'x 1 (2d Cir. 2016).  "The defendant need not persuade the court that it was actually motivated by the proffered reasons, but it is sufficient if the defendant's evidence raises a

---

[9] To be clear, where a plaintiff offers "direct evidence of discrimination," she need not proceed under *McDonnell Douglas*.  *See Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015).  However, because direct evidence of discrimination is often absent, *McDonnell Douglas* offers an alternative path for plaintiffs to establish discriminatory intent.  *See id.*; *see also EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014) ("[W]hile a discrimination complaint need not allege facts establishing each element of a prima facie case of discrimination to survive a motion to dismiss, it must at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible . . . ." (citations, quotation marks, and alterations omitted)).

[10] Similarly, to state a retaliation claim, a plaintiff must allege that: "[(1)] a plaintiff was engaged in protected activity; [(2)] the alleged retaliator knew that [the] plaintiff was involved in protected activity; [(3)] an adverse decision or course of action was taken against plaintiff; and [(4)] a causal connection exists between the protected activity and the adverse action."  *Weixel v. Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 148 (2d Cir. 2002) (citations and quotation marks omitted); *accord McGuire-Welch v. House of the Good Shepherd*, 720 F. App'x 58, 62 (2d Cir. 2018).

genuine issue of fact as to whether it discriminated against the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981) (citation and footnote omitted). If the defendant presents legitimate reasons for the employment action, the burden shifts back to the plaintiff to establish that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Sattar*, 129 F. Supp. 3d at 137 (quotation marks omitted) (citing *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004)). Ultimately, Plaintiff must establish not only the presence of a discriminatory motive, but that this motive was a "but-for" cause of the adverse action. *Natofsky v. City of New York*, 921 F.3d 337, 349 (2d Cir. 2019).

The above framework, although largely developed in the context of the summary judgment stage, applies with equal force to motions to dismiss. "To the same extent that the *McDonnell Douglas* temporary presumption reduces the facts a plaintiff would need to *show* to defeat a motion for summary judgment prior to the defendant's furnishing of a non-discriminatory motivation, that presumption also reduces the facts needed to be *pleaded* under *Iqbal*." *Littlejohn*, 795 F.3d at 310. Accordingly, Plaintiff may rely on a reduced "pleading burden, so that the alleged facts need support only a minimal inference of bias." *Doe v. Columbia Univ.*, 831 F.3d 46, 56 (2d Cir. 2016); *see also Dooley v. JetBlue Airways Corp.*, 636 F. App'x 16, 21 (2d Cir. 2015) (applying *Littlejohn*'s "minimal inference of discriminatory motivation" standard to ADA claims (citation and quotation marks omitted)).

Here, Defendants challenge only the fourth element of Plaintiff's prima facie case, particularly whether Plaintiff has adequately alleged that she suffered an adverse employment action. (*See* Cty. Mem. 8.) Defendants argue that Plaintiff only received "verbal and written counselings . . . [and n]one of those incidents had any effect on her wages or job status." (*Id.*) While Defendants' factual assertions may prove correct at a later stage of the proceedings, the

Amended Complaint asserts otherwise.  For example, Plaintiff alleges that Defendants at one

point "forc[ed] Plaintiff onto an involuntary leave without pay."  (Am. Compl. ¶ 141.)[11]  This

allegation is sufficient, at this stage of the proceedings, to overcome Defendants' argument.  *See*

*Lovejoy-Wilson*, 263 F.3d at 223 (finding suspension without pay sufficient to constitute an

adverse employment action for purposes of establishing prima facie retaliation claim).[12]

---

[11] Defendants appear to fiercely contest this factual allegation, explaining that Plaintiff's accruals were "restored in full when she returned to work" and that Plaintiff "did not lose any compensation, accruals, promotions or benefits."  (Cty. Reply Mem. 4.)  If Defendants' contentions are accurate, they could be fatal to Plaintiff's allegation of an adverse employment action.  *See McKinney v. Dep't of Transp.*, 168 F. Supp. 3d 416, 423 (D. Conn. 2016) ("[Plaintiff's] reinstatement with pay and benefits rendered her suspension without pay following the arbitration award a mediate action such that she cannot now demonstrate that she suffered an adverse employment action."); *Rommage v. MTA Long Island R.R.*, No. 08-CV-836, 2010 WL 4038754 at *15 (E.D.N.Y. Sept. 30, 2010) ("[P]laintiff has failed to allege an adverse employment action because she was reinstated with back pay."); *Krinsky v. Abrams*, No. 01-CV-5052, 2007 WL 1541369, at *8 (E.D.N.Y. May 25, 2007) ("Mediate actions . . . even if constituting an adverse employment action, may not lead to legally cognizable harm if by some subsequent action on the part of the employer, the employee is restored to his or her previous status."), *aff'd*, 305 F. App'x 784 (2d Cir. 2009).  However, as the asserted reinstatement does not appear in the Amended Complaint, the Court cannot consider it at this stage.  The Court notes, however, that the deliberate omission of such a fact could be problematic for Plaintiff.

[12] Defendants are correct that discrimination claims based solely on excessive scrutiny and unspecified "discipline" are precluded by clear caselaw.  *See Opoku v. Brega*, No. 15-CV-2213, 2016 WL 5720807, at *7 (S.D.N.Y. Sept. 30, 2016) ("[E]xcessive scrutiny, criticism, and negative evaluations of an employee's work are not materially adverse employment actions unless such conduct is accompanied by negative consequences, such as demotion, diminution of wages, or other tangible loss." (citation and quotation marks omitted)); *Jaeger v. N. Babylon Union Free Sch. Dist.*, 191 F. Supp. 3d 215, 226 (E.D.N.Y. 2016) (explaining that "close monitoring by a supervisor or excessive scrutiny" do not "constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation" (citations and quotation marks omitted)); *Hall v. N.Y.C. Dep't of Transp.*, 701 F. Supp. 2d 318, 336 (E.D.N.Y. 2010) (explaining that "reprimands and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation" (citation, alteration, and quotation marks omitted)).  The same holds true for claims based on the delivery of counseling memoranda.  *See St. Juste v. Metro Plus Health Plan*, 8 F. Supp. 3d 287, 307–08 (E.D.N.Y. 2014) (explaining that "a counseling memorandum, standing alone, does not constitute an adverse employment action" (collecting cases)); *Morales v. N.Y. State Dep't of Labor*, 865 F. Supp. 2d 220, 244 (N.D.N.Y. 2012) (explaining that the "issuance of a counseling memorandum and a notice of discipline . . . is not

4.  ADA Failure to Accommodate Claims

"Discrimination in violation of the ADA includes, *inter alia*, 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'"  *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009) (quoting 42 U.S.C. § 12112(b)(5)(A)).  To establish a prima facie claim of disability discrimination based on the failure to accommodate, a Plaintiff must establish that: "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."  *McMillan*, 711 F.3d at 125–26.  Once a plaintiff has established a prima facie case, the burden shifts to the defendant to show "(1) that making a reasonable accommodation would cause it hardship, and (2) that the hardship would be undue."  *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999) (citation omitted).  Plaintiff must plead sufficient facts to raise the inference "that the failure was motivated by discriminatory intent."  *Lyman v. City of New York*, No. 01-CV-3789, 2003 WL 22171518, at *6 (S.D.N.Y. Sept. 19, 2003) (citation and quotation marks omitted); *see also Logan v. Matveevskii*, 57 F. Supp. 3d 234, 258 (S.D.N.Y. 2014) ("[A] plaintiff is required to provide evidence that the delay was motivated by the employer's discriminatory intent, as opposed to mere negligence.").

In their memoranda, Plaintiff and Defendants engage in a vociferous argument concerning whether Defendants, in fact, granted Plaintiff a reasonable accommodation. Defendants insist that Plaintiff was accommodated when she "was transferred to a quieter

---

an adverse employment action as a matter of law" (citations and quotation marks omitted)), *aff'd*, 530 F. App'x 13 (2d Cir. 2013).  Accordingly, if Plaintiff cannot substantiate her claims of a suspension, Defendants will likely succeed at summary judgment on this basis.

environment, which she desired, once medical documentation was provided." (Cty. Mem. 7.)
By contrast, Plaintiff maintains that while she briefly worked the night shift (which was
"unsatisfactory to her"), she has recently "been working in [the same] exact position as before
without accommodations." (Pl.'s Cty. Mem. 7–8.) However, regardless of facts in the real
world, the Court must consider only those factual allegations included in the operative
complaint. *See Arriaga v. Gage*, No. 16-CV-1628, 2018 WL 1750320, at *8 n.14 (S.D.N.Y.
Apr. 6, 2018) (explaining that facts asserted in briefs, rather than a complaint, cannot be
considered). Here, the allegations in the Amended Complaint suggest that Plaintiff never
received a reasonable accommodation. Indeed, the Amended Complaint says nothing about a
transfer to a "quieter environment," but simply states that "Defendants refused to assign Plaintiff
to the desk area . . [, and i]nstead assigned Plaintiff to the worst place in the jail five days a
week." (Am. Compl. ¶ 185.) At this stage of the proceedings, the Court cannot simply assume
that this assignment (to which Plaintiff clearly objects) constituted a "reasonable
accommodation."[13] Accordingly, because Plaintiff has alleged that her "employer has refused"
to provide a requested accommodation, *McMillan*, 711 F.3d at 125–26, and because her
description of her alleged transfer does not suggest that it was an alternative "reasonable
accommodation," her failure-to-accommodate claim survives the instant Motion. *See Noll v.
Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (explaining that "[t]he reasonableness of
an employer's accommodation is a 'fact-specific' question that often must be resolved by a

---

[13] The Court notes, however, "that employees are not entitled to hold out for the 'most
beneficial accommodation.'" *Baker v. Home Depot*, 445 F.3d 541, 548 (2d Cir. 2006) (citing
*Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986)). As such, an accommodation that
resolves the difficulties associated with a disability is deemed reasonable so long as it does not
cause the employee to suffer "an inexplicable diminution in [her] employee status or benefits" or
"impose[] a significant work-related burden on the employee without justification." *Id.*

factfinder," or, occasionally, "at the "summary judgment [stage,] if, on the undisputed record, the

existing accommodation is 'plainly reasonable'" (citations omitted)).

### III.  Conclusion

For the reasons stated above, the Berkower Motion is granted in full, and the County

Motion is partially granted and partially denied.  All claims against the Individual Defendants,

and all § 1983 claims, are dismissed.  As Plaintiff has already amended her complaint once, and

as the Court previously warned Plaintiff that any subsequent dismissal would be with prejudice,

(*see* Dkt. (minute entry for June 11, 2019)), dismissal is with prejudice.  Plaintiff may continue

to prosecute her ADA claims against Westchester County.[14]

The Clerk is respectfully directed to terminate the pending Motions, (Dkt. Nos. 58, 68).

SO ORDERED.

DATED:       July 28, 2020
             White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[14] No Party's papers address Plaintiff's Rehabilitation Act claims.  Accordingly, and as the relevant legal standards under the Rehabilitation Act and ADA are substantially identical, *Natofsky*, 921 F.3d at 352 (discussing the standards for claims "under either the ADA or the Rehabilitation Act"); *Kho v. N.Y. & Presbyterian Hosp.*, 344 F. Supp. 3d 705, 717 (S.D.N.Y. 2018) (explaining that discrimination claims under both the ADA and Rehabilitation Act "are analyzed pursuant to the burden-shifting framework described in *McDonnell[]Douglas*" (citations omitted)), these claims survive as well.